# EXHIBIT A

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

|  |  |
|---|---|
| EchoSpan, Inc., | ) |
| **Plaintiff,** | ) |
| v. | ) |
| Medallia, Inc. | ) |
| **Defendant.** | ) |

Civil Action No. ___21CV8452___

**Jury Trial Demanded**

## COMPLAINT

Plaintiff EchoSpan, Inc. ("EchoSpan") files this Complaint ("Complaint") to enjoin Defendant Medallia, Inc. ("Medallia") from continued unlawful and improper use of EchoSpan's confidential information and technology; from continued interference with EchoSpan's current and prospective business partners; to comply with Medallia's contractual obligations to EchoSpan; and to avoid further injury as a result of Medallia's wrongful conduct as descrbied herein. EchoSpan further seeks monetary damages and all remedies available to it as a result of the wrongful conduct alleged herein.

## Parties, Jurisdiction and Venue

1. Plaintiff EchoSpan is a Georgia corporation that maintains its principal place of business at 1075 Lullwater Road NE, Atlanta, Georgia, 30307.

2.      Defendant Medallia is a Delaware corporation that maintains its principal place of business at 575 Market Street, Suite 1850, San Francisco, California, 94105.

3.      This Court has jurisdiction over the subject matter of this action and venue is proper in this Court.

4.      In particular, venue is proper in this County pursuant to O.C.G.A. § 14-2-510(b)(2)-(3), because DeKalb County is the county where the cause of action originated; through its engagement with EchoSpan, Medallia transacts business in DeKalb County; and Medallia has voluntarily subjected itself to suit in this Court pursuant to the Terms and Conditions ("Ts&Cs"), attached hereto as Exhibit A, § 1 ("[T]he party seeking relief may seek injunctive or other appropriate relief in the state court of competent jurisdiction in DeKalb County, Georgia (for actions filed in state court) or the United States District Court for the Northern District of Georgia, Atlanta Division (for actions filed in federal court) and you consent to exclusive jurisdiction and venue in such courts.").

## Facts



6.      EchoSpan has spent years developing a Web-based software tool that facilitates an organization's employee review process.  EchoSpan's tool allows for 360-degree feedback, meaning that employees and managers can effectively review each other, both confidentially and efficiently.

7.      EchoSpan has dedicated thousands of hours to developing this tool; it has a protected copyright as to the source code for this tool; and it has engaged in extensive efforts to maintain the propriety and secrecy surrounding the functional and non-functional requirements of this tool.

8.      EchoSpan has been intentional in its product development, designing all facets of the tool because of competitive value.

9.      █████████████████████████████████████████
███████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████
      ████████████████████████████████





12. The existence of these features, and the way they work together within the integrated platform of the tool, is unique in the industry. EchoSpan has spent thousands of employee hours developing these attributes and ensuring that they work seamlessly with the other attributes of the tool.

13. The compilation of these attributes, and the way that the tool presents these features together, is EchoSpan's competitive advantage.

14. The compilation of these attributes, and the ways that the tool allows EchoSpan customers to utilize these features, is confidential information that is of significant competitive value.

15. It is because of these attributes that the tool has been a commercial success and gives EchoSpan a competitive advantage in its industry.

16. EchoSpan has licensed hundreds of organizations to use its tool, customizing it as appropriate in each instance, and ultimately allowing for the review

of hundreds of thousands of employees.  As explained in more detail below, each of EchoSpan's customer-organizations agrees to be bound by EchoSpan's Ts&Cs, or other similar agreements, which include important confidentiality safeguards and limitations on the permissible use of the tool, so as to preserve and protect EchoSpan's trade secrets and maintain its competitive advantage.

17. EchoSpan's clients include large multi-national organizations with thousands of employees and sophisticated software needs.

22. Unfortunately, this positive and successful working relationship changed after Medallia's introduction to EchoSpan's tool.

23. In mid-January 2021, Medallia requested a trial of EchoSpan's tool by contacting the company's sales team.

24. At the time of Medallia's initial engagement with EchoSpan, EchoSpan understood Medallia to be a legitimate user of EchoSpan's tool, either directly, for the benefit of Medallia employees, or as a licensee that would combine the tool with other services Medallia provides to its customers.

25. Specifically, by agreeing to the Ts&Cs, Medallia acknowledged that it may use the tool "only for the purpose of evaluation of the Hosted Services for purchase". (Ts&Cs, §3.g).

26. The Ts&Cs also made clear that "EchoSpan retains all ownership rights in the EchoSpan Hosted Services as well as any customizations to the application" (*id.*, § 4.d); that these Medallia employees would not use or disclose any EchoSpan Confidential Information (*id.*, §12.c); that Medallia would not "resell, sublicense . . . or otherwise make Hosted Services available to any third party other than as contemplated by this Agreement (*id.*, §19.b); and that Medallia would not "modify,

copy or create derivative works based on the Hosted Services" or "reverse engineer the Hosted Services" (*id.*,§19.c).

27.     Of course, these terms are in addition to the limitations already imposed by the law.

28.     Those limitations include that Medallia could not improperly interfere with existing or even prospective EchoSpan business relationships; improperly usurp EchoSpan's intellectual property; engage in any unfair or deceptive business practices; and it certainly could not mislead EchoSpan as to the reasons for its interest in EchoSpan or its tool in return for gaining access to EchoSpan's trade secrets.

29.     These terms, and Medallia's agreement to them, are critical to EchoSpan in deciding to allow Medallia to access the tool.

30.     Access to the tool allowed Medallia to identify and catalogue all of the tool's attributes – the aspects of the tool that are confidential and competitively valuable – and to understand how these attributes work together in the integrated platform.

31.     EchoSpan carefully limits access to the tool so as to maintain the confidentiality of this information and to preserve its competitive advantage.

32.     While Medallia committed to abide by these terms, Medallia's interaction with the tool was otherwise unusual.

33.     Medallia styles itself as a "pioneer and market leader in customer, employee, citizen and patient experience." (*See* Medallia Corporate Overview, available at https://investor.medallia.com/overview/default.aspx).

34.     It provides a "software-as-a-service" platform (Medallia Form 10-K, for fiscal year 2021, at 2, available at https://investor.medallia.com/overview/default.aspx) that it characterizes as a "purpose-built early warning system for customer and employee retention, making systems and people across organizations customer-aware, enabling transformational business impact" (*id.* at 3).

35.     In other words, Medallia is a software company and, as EchoSpan now understands, a potential competitor of EchoSpan.

36.     Upon information and belief, Medallia does not offer a product similar to EchoSpan's tool – meaning one that facilitates 360-degree feedback.

37.     Beyond the nature of Medallia's business, Medallia's interest in the EchoSpan tool was unusual because, as EchoSpan later learned, the Medallia employees who sought out access to EchoSpan's tool were software developers, specifically product design employees, not human resource professionals.

38.     EchoSpan learned this expertise of Medallia employees only after they accessed EchoSpan's tool and in connection with investigating Medallia's use of EchoSpan's confidential information and trade secrets.

39.     EchoSpan's client contacts typically are human resources professionals responsible for managing the review process that the EchoSpan tool is used to address.

40.     Beyond the expertise of the people that engaged with EchoSpan's tool, the number of people (seven in total) and the extent of their investigation of the tool's capabilities was unusual.

41.     The seven Medallia users that agreed to the Ts&Cs, on Medallia's behalf, and explored the product, sought access as administrative users.

42.     Administrative access is more than sufficient to understand the tool and its design, however, and to gain knowledge of the components of the tool that create EchoSpan's competitive advantage.

43.     These seven Medallia product designers accessed EchoSpan's tool almost 90 times in a month-long period.  In contrast, users legitimately exploring EchoSpan's tool average approximately seven separate logins in this time period.

44.     Through that access, these employees gained familiarity with the tool and its functionality.

45.     Medallia employees were able to access virtually all of the functional and non-functional requirements of EchoSpan's tool.

46.     EchoSpan learned the level of engagement Medallia employees obtained only after they accessed EchoSpan's tool and in connection with

investigating Medallia's use of EchoSpan's confidential information and trade secrets.

47.    The repeated access by Medallia employees is not consistent with evaluating the tool for purposes of purchasing a license, as Medallia employees represented.

48.    The only plausible purpose behind the access Medallia obtained is reverse engineering of EchoSpan's tool and other improper use of EchoSpan's confidential and trade secret information.

49.    Medallia's improper and unauthorized access to EchoSpan's tool was not its only wrongful and deceitful conduct.

███  █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████

███  █████████████████████████████████

███████████████████████████████████████

██████████████████████████

███  █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████





███ ██████████████████████████████

███████████████████████████████████

██████████████████████████

## Count I – Breach of Contract

67. Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

68. Seven different Medallia employees agreed to the Ts&Cs, on Medallia's behalf, to gain access to EchoSpan's tool.

69. The Ts&Cs are an enforceable contract between EchoSpan and Medallia.

70. Among other things, the Ts&Cs acknowledged Medallia's commitment that "Free Trial accounts may be used only for the purpose of evaluation of the Hosted Services for purchase by the Client" (Ts&Cs, § 3.g); that "EchoSpan retains all ownership rights in the EchoSpan Hosted Services as well as any customizations to the application" (*id.*, § 4.d); that these Medallia employees would not use or disclose any EchoSpan Confidential Information (*id.*, §12.c); that Medallia would not "resell, sublicense . . . or otherwise make Hosted services available to any third party other than as contemplated by this Agreement (*id.*, §19.b); and that Medallia would not "modify, copy or create derivative works based on the Hosted Services" or "reverse engineer the Hosted Services" (*id.*,§19.c).

71. Medallia has breached these obligations.



**Count II –** ████████████████████████.

74.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

██████████████████████████████████████

████████████████████████████████

██    ████████████████████████████████

████████████████████

██    ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

### <u>Count III – Tortious Interference with Prospective<br>Business Relationships</u>

80.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

81.    EchoSpan's tool is unique in the marketplace, and it fills a critical need that a variety of clients, creating existing and prospective business relationships between EchoSpan current and prospective clients.

██    ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████

██  ████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████

## Count IV – Fraudulent Misrepresentation

84.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

85.    In connection with gaining access to EchoSpan's product, and specifically in agreeing to the Ts&Cs, Medallia employees represented that they intended to explore the EchoSpan product for legitimate reasons.

86.    Medallia represented that it would use the access EchoSpan provided "only for the purpose of evaluation of the Hosted Services for purchase by the Client". (Ts&Cs, § 3.g).

87.    This acknowledgement and representation was crucial to EchoSpan providing access to the seven Medallia software engineer employees that sought such access.

88.    In reliance on this representation, EchoSpan provided access as the Ts&Cs contemplated.

89. In contravention to this representation, Medallia accessed EchoSpan's product for purposes of interfering with EchoSpan's legitimate business interests, usurping existing and prospective commercial relationships, improperly using EchoSpan's confidential information and intellectual property, and reverse engineering EchoSpan's product.

███  ████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

## <u>Count V – Conversion</u>

91. Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

92. EchoSpan owns the confidential information and intellectual property that Medallia accessed through its exposure to the EchoSpan product.

93. The confidential information includes all of the attributes of the tool identified in Paragraphs 9-15 above and the ways in which these attributes work seamlessly together within EchoSpan's tool.

94. Medallia has obtained this confidential information and is now using it for purposes inconsistent with the limitations EchoSpan imposed on Medallia when providing access to the information.

95.    EchoSpan has demanded return of this information, through pre-suit communications, but Medallia has refused to return the information and intellectual property.

## Count VI – Unjust Enrichment

96.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

97.    In the alternative to EchoSpan's claim for breach of contract, and to the extent the Court concludes the Ts&Cs are not an enforceable contract that governs the terms of Medallia's use of information, Medallia has been unjustly enriched as a result of its use of this information.

98.    Absent compensation for the confidential information and intellectual property EchoSpan has provided, Medallia would be unjustly enriched.

## Count VII – Unfair Trade Practices

99.    Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

100.    Medallia obtained access to EchoSpan's product by representing its intention to legitimately explore a business relationship with EchoSpan.

101.    These representations were made in the Ts&Cs, including Medallia's commitment that "Free Trial accounts may be used only for the purpose of evaluation of the Hosted Services for purchase by the Client" (Ts&Cs, § 3.g); that "EchoSpan retains all ownership rights in the EchoSpan Hosted Services as well as

any customizations to the application" (*id.*, § 4.d); that these Medallia employees would not use or disclose any EchoSpan Confidential Information (*id.*, §12.c); that Medallia would not "resell, sublicense . . . or otherwise make Hosted services available to any third party other than as contemplated by this Agreement (*id.*, §19.b); and that Medallia would not "modify, copy or create derivative works based on the Hosted Services" or "reverse engineer the Hosted Services" (*id.*,§19.c).

102. These representations were misleading, created a likelihood of confusion as to Medallia's intention, and, thus, constitute an unfair trade practice under O.C.G.A. § 10-1-372(a).

103. Contrary to these representations, Medallia intended, at the time it first began interacting with EchoSpan, to interfere with EchoSpan's legitimate business interests, usurp existing and prospective commercial relationships, improperly use EchoSpan's confidential information and intellectual property, and reverse engineer EchoSpan's product.

104. This misleading and deceptive activity was willful and Medallia knew it to be deceptive.

105. Medallia's continued use of EchoSpan's information, obtained through misleading means, is likely to damage EchoSpan.

106. Pursuant to O.C.G.A. § 10-1-373(a), and under principles of equity, EchoSpan is entitled to an injunction prohibiting further unfair practices of Medallia.

107.   In addition, pursuant to O.C.G.A. § 10-1-373(b), costs should be awarded to EchoSpan.

## Count VIII – Defend Trade Secrets Act

108.   Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

109.   EchoSpan's product, and the confidential information associated with that product provided to Medallia through its review of the product, constitute a trade secret as defined in 18 U.S.C. § 1839.

110.   The confidential information includes all of the attributes of the tool identified in Paragraphs 9-15 above and the ways in which these attributes work seamlessly together within EchoSpan's tool.

111.   EchoSpan has taken reasonable measures to preserve the confidentiality and secrecy of such information.

112.   EchoSpan derives independent economic value from this information because it is not readily ascertainable by proper means by a competitor.



114. Specifically, Medallia deceived EchoSpan and sought access to the product by misrepresenting its intention to engage with EchoSpan on a legitimate business transaction.

115. EchoSpan seeks all available remedies authorized under 18 U.S.C. § 1836 as a result of this misappropriation, including injunctive relief, an award of compensatory damages, double damages, because the misappropriation was willful and malicious, and attorneys' fees.

## Count IX – Computer Systems Protection Act

116. Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

117. By accessing EchoSpan's tool using false pretenses and in violation of the Ts&Cs, Medallia used a computer network without authority and with the intention of removing, either temporarily or permanently, EchoSpan's product, and otherwise interfered with EchoSpan's use of this product.

118. By accessing EchoSpan's tool using false pretenses and in violation of the Ts&Cs, Medallia used a computer network with the intention of examining EchoSpan's confidential information, including financial information.

119. Georgia law deems these actions criminal, pursuant to O.C.G.A. § 16-9-93 and authorizes EchoSpan to seek civil relief pursuant to O.C.G.A. § 16-9-93(g).

## Count X – Trade Secrets Act

120.   Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

121.   EchoSpan's product, and the confidential information associated with that product provided to Medallia through its review of the product, constitute a trade secret as defined in O.C.G.A. § 10-1-761.

122.   The confidential information includes all of the attributes of the tool identified in Paragraphs 9-15 above and the ways in which these attributes work seamlessly together within EchoSpan's tool.

123.   EchoSpan has taken reasonable measures to preserve the confidentiality and secrecy of such information.

124.   EchoSpan derives independent economic value from this information because it is not readily ascertainable by proper means by a competitor.

125.   Medallia misappropriated this product, and confidential information associated with this product.

126.   Specifically, Medallia deceived EchoSpan and sought access to the product by misrepresenting its intention to engage with EchoSpan on a legitimate business transaction.

127.   EchoSpan seeks all available remedies authorized under O.C.G.A. § 10-1-762; § 10-1-763; and § 10-1-764 as a result of this misappropriation, including

injective relief, an award of compensatory damages, exemplary damages, because the misappropriation was willful and malicious, and attorneys' fees.

## Count XI – Attorneys' Fees

128.   Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

129.   By obtaining EchoSpan's information and access to EchoSpan's tool through improper means, using this information to usurp existing and prospective business relationships, and misappropriating EchoSpan's confidential information and trade secrets, Medallia has acted in bad faith and caused the Plaintiff unnecessary trouble.

130.   Under O.C.G.A. § 13-6-11, EchoSpan is entitled to an award of attorneys' fees.

## Count XII – Injunctive Relief

131.   Plaintiff incorporates by reference the allegations of the preceding paragraphs of the Complaint as if fully set forth herein.

132.   EchoSpan seeks monetary damages and statutory damages as allowed by law.

133.   Nevertheless, given the confidential information and trade secrets Medallia has improperly accessed, used, and misappropriated, and the critical business relationships that Medallia is interfering with, monetary damages would not provide adequate relief.

134. EchoSpan seeks an injunction to prohibit Medallia from the wrongful conduct alleged herein.

WHEREFORE, Plaintiff demands judgment jointly and severally in its favor and against Defendant for:

(1)    the full payment of damages for all the causes of action herein alleged;

(2)    the full payment of other compensatory damages as may be proven at trial;

(3)    All damages authorized by the applicable statutes, including double damages where authorized;

(4)    pre-judgment interest on all the compensatory damages amounts proven at trial;

(5)    punitive damages as appropriate for the causes of action herein alleged;

(6)    attorneys' fees, expenses, and costs; and

(7)    such other relief as the Court deems just and proper.

Plaintiff demands a trial by jury.

DATED: September 24, 2021.

*/s/ Jonathan R. Chally*
Jonathan R. Chally
Georgia Bar No. 141392
Joshua P. Gunnemann
Georgia Bar No. 152250

COUNCILL, GUNNEMANN &
CHALLY LLC
1201 Peachtree Street NE
Building 400, Suite 100
Atlanta, GA  30361
jchally@cgc-law.com                    *Counsel for Plaintiff*
jgunnemann@cgc-law.com

# EXHIBIT A



360 Feedback    Features & Pricing    Consultants    Support    About    [Ask a Question]    [Sign In]

# EchoSpan Terms & Conditions

By continuing to use this site (the "Hosted Service"), you agree to the following terms and conditions:

These Terms and Conditions ("Terms and Conditions") govern your ("Client" or "you") use of our product and services (the "Hosted Services") and our website EchoSpan.com (the "Site"). By using Hosted Services you agree to these Terms and Conditions. If you do not agree to these Terms and Conditions, you may not use the Hosted Services or visit or browse the Site. These Terms and Conditions constitute a binding legal agreement between you and EchoSpan, Inc. ("EchoSpan", "we," "us," and "our"). Please read them carefully.

Incorporated into these Terms and Conditions is EchoSpan's Data Processing Agreement, available <u>here</u>.

## 1. GOVERNING LAW AND JURISDICTION

This Agreement will be construed under the laws of the State of Georgia without reference to conflicts of law provisions. Any dispute in connection with these Terms and Conditions, the Hosted Services and the Site shall be submitted to confidential arbitration in Atlanta, Georgia, USA, except that to the extent (i) you have in any manner violated or threatened to violate our intellectual property rights or (ii) either party has in any manner violated or threatened to violate the confidentially provisions set forth in Section 11, the party seeking relief may seek injunctive or other appropriate relief in the state court of competent jurisdiction in DeKalb County, Georgia (for actions filed in state court) or the United States District Court for the Northern District of Georgia, Atlanta Division (for actions filed in federal court) and you consent to exclusive jurisdiction and venue in such courts. Arbitration under these Terms and Conditions shall be conducted under the rules then prevailing of the American Arbitration Association. The arbitrator's award shall be binding and may be entered as a judgment in any court of competent jurisdiction. To the fullest extent permitted by applicable law, no arbitration under these Terms and Conditions shall be joined to an arbitration involving any other party subject to these Terms and Conditions, whether through class arbitration involving any other party subject to these Terms and Conditions, whether through class arbitration proceedings or otherwise.

## 2. MODIFICATIONS TO TERMS AND CONDITIONS

Unless a separate written agreement exists between EchoSpan and the Client, we reserve the right to change these Terms and Conditions without notice by (a) posting a revision on this Site; or (b) sending information regarding the amendment to the email address you provide to us. YOU ARE RESPONSIBLE FOR REGULARLY REVIEWING THIS SITE TO OBTAIN TIMELY NOTICE OF ANY AMENDMENTS. YOU SHALL BE DEEMED TO HAVE ACCEPTED SUCH AMENDMENTS BY CONTINUING TO USE THE HOSTED SERVICES FOR MORE THAN 10 DAYS AFTER SUCH AMENDMENTS HAVE BEEN POSTED OR INFORMATION REGARDING SUCH

AMENDMENTS HAS BEEN SENT TO YOU. You agree that we shall not be liable to you or to any third party for any modifications of the Terms and Conditions.

## 3. USE OF THE ECHOSPAN SERVICE

a. In providing Hosted Services, several system functions require that we periodically send automated email to review administrators and review participants ("System Email"). The content of these emails are regulated by EchoSpan and are subject to edits by EchoSpan management.

b. Client agrees to adhere to all industry-standard guidelines and applicable law with regard to unsolicited email when using Hosted Services, and that the email address(es) you enter into the system belong to willing participants. Emailing of unsolicited email, or emailing participants after they have submitted a written request to be excluded or unsubscribe will result in suspension of Client's account on the first occurrence and termination of Client's account on any subsequent occurrence. No refunds will be made on accounts terminated due to email abuse.

c. We do not support the use of "personal" or non-corporate email addresses for the sending or receiving of System Email. Due to spam filtering restrictions, these addresses (such as those ending in yahoo.com, gmail.com, comcast.net, hotmail.com, outlook.com, etc.) are unsuitable and unreliable for use in an online enterprise application. Client agrees to assume responsibility for any support and performance problems arising from use of non-corporate addresses.

d. Client agrees to assume responsibility for the delivery of System Email to the users of the service, and assume any costs associated with adjustments or modifications necessary to recipients' firewalls or spam filters required for delivery of System Email.

e. Hosted Service licenses may not be transferred to any other person or entity and except as expressly set out in the Terms and Conditions are intended for use only within your organization.

f. EchoSpan will automatically and permanently delete Client's data housed in the Hosted Service after the termination of Client's subscription.

g. Free Trial accounts may be used only for the purpose of evaluation of the Hosted Services for purchase by the Client. Unless otherwise agreed in writing, a Free Trial entitles the Client to access the Hosted Services for a period of 30 days. Only one free trial per Client is permitted. EchoSpan reserves the right to cancel a Free Trial account at any time without notice and for any reason. EchoSpan also reserves the right to modify features on Free Trial accounts without notice.

h. The following types of businesses or organizations are NOT allowed to participate in the EchoSpan Hosted Services: organizations encouraging illegal activity or racism, organizations providing instructions or discussions about performing illegal activities, sites that promote or utilize software or services designed to deliver unsolicited email, or any other sites we deem to be inappropriate.

i. For Clients licensing the EchoSpan Hosted Service for use with their own customers, online advertising (via Google Adwords, Bing, Capterra etc.) of services pertaining to 360-Degree Feedback that compete with EchoSpan's advertisements are not permitted.

## 4. OWNERSHIP AND LICENSES

a. There are two methods of licensing the EchoSpan Hosted Services: 1) Pay-per-review (PPR) plans and 2) Companywide Subscription Plans (CSP). Licensing type is selected by the Client at the time of initial purchase and cannot be modified except by creation of a new Client account.

b. Licensing under a PPR plan. Under a PPR licensing plan, Client purchases a user license for each person that is to be the subject of feedback. Unless deemed an "Unlimited" annual license, a PPR license is good for one feedback instance and may not be re-used. PPR licenses may receive feedback from up to 100 individuals. "Unlimited" annual licenses are governed by the terms in section 4h. Providers of feedback (Raters) under PPR plans do not require user licenses in order to participate in feedback reviews. On Starter and Professional accounts, PPR licenses unused at the time of Client's account renewal may be "rolled over" to the next contract year. Accounts with special, volume or promotional discounts (i.e. for non-profit status), or Enterprise accounts may not roll over unused licenses from one year to the next without written agreement between EchoSpan and Client, or, by the payment of an annual, per-license roll-over fee. The roll-over fee is typcally $20 US per license, per year but may vary based on customizations applied to Client's account, special support requirements or other factors. PPR plans require on-time payment of licensing and annual subscription fees in order to remain active. Client's annual fees may vary from year to year when a multi-year agreement is not in place. For the first subscription year, annual fees are computed using EchoSpan's publicly available pricing calculator availabl here. Subsequent years' annual fees may vary based on the number of licenses purchased at the time of renewal and/or contract length selected by the customer.

c. Licensing under a CSP. Under CSP licensing, Client purchases a user license for every employee that needs access to the Hosted Services (CSP licenses are "named" licenses). Client is responsible for managing its license usage. During the subscription year, users Client adds to the system, whether by manual entry, flat file import or API import will be billed at the then-current license rates. Licenses added prior to the halfway point of Client's annual subscription year will be billed a full rates. Licenses added after the halfway point and prior to the renewal date will be discounted fifty (50) percent. CSP licenses do not roll-over from year to year and must be renewed annually, but EchoSpan will retain all data for Client' past clients as long as Client's account remains current. In the event that Client's licensed employee headcount decreases by more than twenty (20) percent from one subscription year to the next, EchoSpan reserves the right to increase annual subscription fees by fifty (50) percent to offset costs of hosting data for unlicensed users. CSPs require on-time payment of licensing and annual subscription fees in order to remain active. CSPs are intended for internal use only and cannot be purchased by resellers.

d. EchoSpan retains all ownership rights in the EchoSpan Hosted Services as well as any customizations t the application resulting from Client's suggestions, feedback, recommendations or modification requests. Client may access and export its data (any data entered by the Client's users) at any time during the term of the Client's subscription. Client retains all ownership rights in the data it enters into the EchoSpan Hosted Services. EchoSpan licenses Client copyrighted materials for the sole purpose of the use of the EchoSpan tool and generation of reports. Distribution, modification of all or part of the content in any forr is strictly prohibited for any purpose other than use in the EchoSpan tool. Client may not, without the express prior written permission of EchoSpan distribute or commercially exploit the content. Nor may Client transmit it or store it in any other website or other form of electronic retrieval system.

e. EchoSpan shall have a royalty-free, fully paid-up, nonexclusive, perpetual, irrevocable, worldwide, transferable license to use, copy, modify, or distribute, including by incorporating into any Hosted Service, any suggestions, enhancement requests, recommendations or other feedback provided by Client or its

users relating to the operating of any Hosted Service.

f. PPR BASIC/STARTER edition 360 feedback licenses are limited to 20 respondents (Raters) each.  PPR PROFESSIONAL and ENTERPRISE edition 360 feedback licenses are limited to 100 respondents (Raters) each. Under CSP plans, the maximum number of allowed respondents per feedback is equal to the number of currently licensed and paid users in the system.

g. Unless otherwise agreed in writing, new account setups and license additions are processed within 24 hours of receipt of payment. Note that more complex implementations may require more time.

h. UNLIMITED 360-degree feedback licenses under a PPR plan are "named" licenses. They are assigned to distinct group of feedback recipients (Targets) equal to the number of licenses purchased. Email address i used to identify unique users unless otherwise agreed in writing. Addition of new feedback recipients requires the purchase of new UNLIMITED 360 feedback licenses if they are to be reviewed. Purchase of additional UNLIMITED licenses during the subscription period are not pro-rated and must be renewed on the anniversary date of the account's original subscription purchase. Client is responsible for managing its license usage. Accounts are audited and overages are billed regularly by EchoSpan. Failure to renew an annual subscription results in forfeiture of any unused licenses in Client's account, along with accompanying data from existing reviews.

## 5. USE OF LOGOS, TRADEMARKS AND CONTACT INFORMATION

EchoSpan retains ownership and all rights to EchoSpan logos, trademarks, software, trade secrets, databases, reports, and Site. The EchoSpan corporate logo and company contact information (phone number and Web address) must appear on all screenshots, email and other electronic documents generated by our system. Distribution of materials without the EchoSpan logo, unless otherwise arranged in writing, will be seen as a direct violation of the EchoSpan terms and conditions. Clients licensing the EchoSpan Hosted Services for use with their own customers must display the "Powered By EchoSpan" log on any media where screen captures or other images or content from the EchoSpan system are visible. This includes, but is not limited to presentations, brochures, letters, memoranda, Website pages or any other media, whether delivered printed or electronically. For Web usage, Client should utilize the HTML "img" tag shown below for display of the logo, with no alterations to colors, content or size. For other purposes, Client should use the EchoSpan logo shown below with no alterations to colors, content or size EchoSpan reserves the right to review and modify any media displaying its logo. Client agrees to remove EchoSpan logos, screen capture and any other references to the Hosted Services from all media upon termination of license to Hosted Services.

```
<img src="http://www.echospan.com/~public_images/powered_by_echospan.png" alt="360-Degree
Feedback Powered by EchoSpan | www.echospan.com" border="0">
```

360-Degree Feedback Powered By



## 6. FEES AND PAYMENT TERMS

a. Payment for products and services is due upon receipt of invoice. All discounts applied to products or services (i.e. for volume, contract term, non-profit status) are wholly dependent upon on-time payment and are void if payment is late. Late payments (30 or more days from the date an invoice was sent to Client) are subject to interest charges of 1.5% of the outstanding balance per month, or the maximum amount allowable by law, whichever is lower. Additionally, Client agrees to reimburse EchoSpan for costs incurred in the course of collecting payment on its account (including attorney's fees), which, at a minimum, will be billed at $100 per month while the account is delinquent. Except as expressly set forth in these Terms and Conditions, all purchases are final, non-cancelable and non-refundable at the time of payment. Delinquent and expired accounts are subject to deactivation or deletion. EchoSpan is not responsible for any data in expired accounts or accounts for which payment is past due. Access to the Hosted Services may be withheld on delinquent accounts until all past due balances are paid.

b. Hosted Services pertaining to 360 feedback shall be deemed rendered, complete or billable when one or more of the following occurs: a) The feedback recipient has one or more completed survey responses, b) A report has been generated for a particular target, c) when a target requests feedback via a self-enrollment form, or d) at the expiration of the license agreement between Client and EchoSpan. Additional charges may apply if additional feedback or services is required after the occurrence of one or more of the aforementioned events. Response and report data for past reports will only be maintained for the year in which a license has been purchased, unless otherwise agreed in writing. Targets entered into the system during a previous contract year are read-only and cannot be modified, deleted or re-assigned by the Client.

c. Purchases made by credit card may not be "charged back." In the event customer initiates a "charge back" request with their credit card issuer, customer agrees to pay EchoSpan for all issued licenses and services by check immediately.

d. Client shall be solely responsible for paying and remitting to the appropriate tax authorities all applicable taxes (withholding tax, sales tax, services tax, value-added tax (VAT), goods and services tax (GST), etc.) or duties imposed by any government entity or collecting agency except those taxes based on EchoSpan's net income. In the event Client fails to satisfy its tax and/or duty obligations herein, Client shall reimburse EchoSpan upon demand for any taxes and/or duties paid on behalf of Client and shall defend, indemnify and hold EchoSpan harmless against any claim and/or liability (including penalties) resulting from Client's failure to pay such taxes and/or duties.

e. Client's annual subscription shall renew automatically each year unless otherwise agreed in writing. Client will receive a renewal invoice approximately 90 days prior to the renewal date (defined as the anniversary date of the creation of the Client's account, which is displayed on the My Account tab of the administrative tool). The renewal invoice will include amounts for an annual fee(s) plus the costs of licenses purchased at the time of the previous year's account creation or renewal. If the account is a CSP account, license total for renewal will be calculated as a sum of all user licenses purchased during the previous year. Only payment of the annual fee is required for renewal; license quantities may be changed as Client usage demand or employee headcount requires. Client may cancel its subscription sixty (60) or more days prior to the renewal date by submitting a written cancellation notice to support@echospan.com from the email address that on record as either the primary account administrator or the account billing contact.

## 7. UPDATES AND SUPPORT FOR CUSTOMIZED CODE

Client recognizes and agrees that if its account includes code customizations that cause its instance of

Client recognizes and agrees that if its account includes code customizations that cause its instance of the EchoSpan application to differ functionally from the standard "off-the-shelf" tool, it may not benefit from complimentary, regular updates performed by EchoSpan. Regular updates, including but not limited to bug fixes, browser compatibility updates and new feature additions may interfere with custom functionality and are therefore not applied to customized accounts. Application of updates can be made at the client request but may require billable labor to install and test. All technical support provided for customized code, including but not limited to documentation, maintenance, management, repair or update is performed at our "Normal Rates" as defined in Sections 8 and 9 unless "rush" service is requested by Client, which is billed at the "rush" rates defined in Sections 8 and 9. Support requests for custom code will take longer to evaluate and respond to than requests on the standard tool. Our support team requires a minimum of 24 hours to respond to requests pertaining to customizations.

## 8. SUPPORT FOR PPR AND CSP ACCOUNTS

a. This section applies to Clients that license EchoSpan products under the BASIC/STARTER, PROFESSIONAL and ENTERPRISE editions of the system and pay a base annual subscription and technical support fee. EchoSpan's technical support staff (available for answers to questions and to address system availability issues), unless otherwise contracted in writing, supports the Client's registered and trained administrative user on regular business days during the hours of 8am to 8pm eastern time by submitting support requests through the support portal in the administrative tool.

All clients also have access to toll-free phone support during support hours using a support callback process. Phone support is provided for problems related to system errors, system availability, billing or license purchases. Email support is provided for all other support inquiries including how-to and setup questions. Requests for phone support should be made by submitting a support request via the online ticketing system or by using the toll-free phone-based callback service. Callbacks are provided within the promised response time for a given service level listed below for reference. If a phone request is received for normal support items, EchoSpan may elect to respond by email.

Support response times for each edition of the tool are below. Note that response times exclude holidays and weekends.

Basic/Starter: within 24 hours
Professional: within 4 hours
Enterprise: within 2 hours

Additional support guidelines:

- Support is provided only to registered and trained administrative users on Starter, Professional and Enterprise accounts.

- Support is only provided to Clients with current annual subscriptions. Support is not provided for "free trial" or pro bono accounts.

- Up to five support requests are handled free of charge each calendar month. Additional support requests are billed at a rate of $50 per request or $250 per hour depending on the nature of the request.

- Monthly support overages are invoiced with payment due within 30 days of the invoice date.

- For Starter accounts, one administrator is supported. For all other editions, two administrative users are supported, additional administrator support licenses may be added for $400 (Starter accounts), $750 (Professional accounts), or $2,495 (Enterprise accounts) per year each.

b. Support of custom-built application code and optional, special support. Project management and software development office hours are from 9am to 5pm eastern time. Any support services performed on custom-built application, custom-built reporting components or in accordance with IT requirements dictated by the Client will be billed at normal hourly rates. This includes but is not limited to services such as programming changes, additions, deletions, answering technical questions, completion of security assessments and audits, training and meeting participation. Customization requests requiring "rush" or same-day turnaround will be billed at 2x Normal Rates. A minimum of 8 developer hours are billed for any work performed on holidays or weekends at the "rush" rates. Normal Rates apply to code customizations completed during the normal production calendar. For purposes of these Terms and Conditions "Normal Rates" mean $50.00 per request or $250.00 per hour for technical support or project managers and $350 per hour for software developers. If a technical support request requires 15 minutes or less to resolve then the $50.00 per request rate applies. If a request takes more than 15 minutes to resolve then the $250.00 per hour project manager rate applies. Normal Rates are subject to amendment as set forth in Section 2 of these Terms and Conditions.

c. Activities associated with the completion of Client-requested security/IT assessments are billed at normal rates ($50.00 per request or $250.00 per hour for technical support and $350 per hour for software developers) unless otherwise agreed.

d. Professional Services. Project management and consulting office hours are from 9am to 5pm eastern time for ENTERPRISE accounts. Professional services are billed at normal hourly rates. For purposes of these Terms and Conditions "Normal Rates" mean $50.00 per request or $250.00 per hour for project consulting by our client management team or project managers. EchoSpan professional services include Project Management (EchoSpan will create and manage the Client's projects) and consulting services such as meetings to advise on setup, timing, and reports best practices.

## 9. SUPPORT FOR CONSULTANT OR RESELLER ACCOUNTS WITHOUT A SUPPORT PLAN
This section no longer applies.

## 10. SERVICE LEVEL ASSURANCE
EchoSpan agrees to provide a minimum of 99.5% system availability during any calendar month, excluding regularly scheduled maintenance time for all ENTERPRISE subscriptions. Should EchoSpan fail to provide 99.5% uptime for Hosted Services, Client has the right to terminate its subscription agreement as its sole and exclusive remedy and will be entitled to a prorated refund of the current subscription year's annual subscription fee. Any claims brought under this service level assurance must be made in good faith and within 5 business days after the date of the service interruption. The service level assurance set forth in this Section 10, shall not apply to the extent any problem which results in system availability to be other than as warranted is due to: (i) third party software, hardware or network infrastructure outside of EchoSpan's data center and not under the direct control of EchoSpan; (ii) failure of the external internet beyond EchoSpan's network; (iii) electrical or internet access disruptions; (iv) any actions or inactions of Client in violation of these Terms and Conditions; (v) attacks (i.e. hacks, denial of service attacks, malicious introduction of viruses and disabling devices) caused by third parties; or (vi) a Force Majeure event. Service

level assurance does not apply to BASIC/STARTER or PROFESSIONAL edition subscriptions. BASIC/STARTE and PROFESSIONAL edition subscriptions are provided on an "AS-IS" and "AS-AVAILABLE" basis. Service level assurance applies only paid users of the tool; survey Raters are not guaranteed availability or uptime Availability of Hosted Services will be may be limited for the purposes of maintenance and routine backups during the hours of 3am to 4am ET every morning and 1am to 9am ET on occasional Saturdays. Maintenance requiring additional downtime will be announced on the administrative sign-in page when possible.

## 11. ECHOSPAN LIMITATIONS DUE TO THIRD PARTIES

a. General. Certain EchoSpan services rely on or interoperate with third party products and services. These third party products and services are beyond EchoSpan's control, but their operation may impact or be impacted by the use and reliability of the EchoSpan services. You acknowledge and agree that: (i) the use and availability of certain features of the services are dependent on third party product vendors and service providers, (ii) these third products and services may not operate in a reliable manner 100% of the time, and they may impact the way that the EchoSpan services operate, and (iii) EchoSpan is not responsible for damages and losses due to the operation of these third party products and services.

b. Third Party Service Providers Used By EchoSpan. You acknowledge that EchoSpan uses third party services providers to enable some aspects of the Services including:

- Spell checking of user inputs

- Automated language translations

- "Legal" scanning of user inputs

- Recommended developmental reading suggestions and action guides

- Single sign-on

- Data exchange with HRIS platforms

- Credit card payments

- Sentiment analysis of written feedback

- Verification of email addresses

c. Third Party Products and Services that Work With EchoSpan Services. EchoSpan may provide the opportunity for you to interface to Third Party Products and Services. These Third Party Products and Services are not EchoSpan products and services and you agree that EchoSpan is not responsible for damages or loss that may be caused by them. Third Party Products and Services may have limited availability. Support requests pertaining to third-party services fall outside of EchoSpan's normal Service Level Assurance (SLA) terms.

d. EchoSpan features that generate a "sentiment analysis" of written review comments are provided in partnership with Microsoft Cognitive Services. In using these features, Client agrees to the Microsoft Cognitive Services terms of service found here as of April, 3, 2018. EchoSpan makes no warranties of any kind as to the performance, results, availability or any other quality or function of Microsoft's Cognitive Services tools. Note that Micorsoft's terms of service for this feature is subject to change without notice

Services tools. Note that Micorsoft's terms of service for this feature is subject to change without notice by EchoSpan.

e. EchoSpan features that generate automated language translations of review content and/or review responses are provided in partnership with Google Translate. In using these features, Client agrees to the Google terms of service found here as of May 5, 2018. EchoSpan makes no warranties of any kind as to the performance, results, availability or any other quality or function of Google Translate tools. Note that Google's terms of service for this feature is subject to change without notice by EchoSpan.

f. EchoSpan includes an email address verification feature that automatically tests deliverability to email addresses entered into the system. The purpose of this feature is to reduce the likelihood that incorrect o invalid email addresses are accidentally entered into the system. This feature is provided in partnership with the MailboxLayer API. Clients can elect to turn this feature off if desired.

## 12. CONFIDENTIALITY

a. EchoSpan's Confidential Information. EchoSpan's "Confidential Information" means all confidential and proprietary information of EchoSpan disclosed to Client, whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the informatio and the circumstances of disclosure, including, without limitation, pricing, business and marketing plans, technology and technical information, product designs, and business processes. Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to EchoSpan; (ii) was known to Client prior to its disclosure by EchoSpan without breach of any obligation owed to EchoSpan; (iii) was independently developed by Client without breach of any obligation owed to EchoSpan; or (iv) is received from a third party without breach of any obligation owed to EchoSpan.

b. Client's Confidential Information. Client's "Confidential Information" means all confidential and proprietary information of Client disclosed to EchoSpan, whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the informatio and the circumstances of disclosure. Confidential Information shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to Client; (ii) was known to EchoSpan prior to its disclosure by Client without breach of any obligation owed to Client; (iii) was independently developed by EchoSpan without breach of any obligation owed to Client; or (iv) is received from a third party without breach of any obligation owed to Client.

c. Duty of Care and Use Restrictions. The party receiving Confidential Information is referred to herein as "Receiving Party" and the party disclosing Confidential Information is referred to herein as "Disclosing Party". Receiving Party shall not use or disclose any Confidential Information of Disclosing Party for any purpose outside the scope of Hosted Services, except with Disclosing Party's prior written consent. Receiving Party shall protect the confidentiality of Disclosing Party's Confidential Information in the same manner that it protects the confidentiality of its own confidential information of like kind (but in no event using less than reasonable care). In addition, the Receiving party will disclose the Disclosing Party's Confidential Information only to those of the Receiving Party's personnel who have a "need to know" such Confidential Information (and only to the extent necessary) in order to fulfill the purposes contemplated by the Agreement. Client will ensure that each of its personnel (and its clients in the case of Consultant Users) who have access to EchoSpan's Confidential Information shall be bound to uphold the obligations of confidentiality set forth herein. Each party represents and warrants that it will collect, maintain and

handle all personal data in compliance with all applicable data privacy and protection laws. Receiving Party shall promptly notify Disclosing Party if it becomes aware of any actual or reasonably suspected breach of confidentiality of Disclosing Party's Confidential Information.

d. If Receiving Party is compelled by law to disclose Confidential Information of Disclosing Party, it shall provide Disclosing Party with prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at Disclosing Party's cost, if Disclosing Party wishes to contest the disclosure.

e. If Receiving Party discloses (or threatens to disclose) any Confidential Information of Disclosing Party in breach of confidentiality protections hereunder, Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such acts, it being acknowledged by the parties that any other available remedies are inadequate.

## 13. RISK OF USE & IMPROPER USE

a. Client agrees to use Hosted Services at its own risk. Client agrees that it has made its own determination regarding the usefulness of the Hosted Services.

b. Client assumes all liability for use of the system inside or outside of recommended use guidelines as provided in documentation or training. Misuse of the tool for any reason deemed inappropriate by EchoSpan may result in termination of the account. Client agrees to adhere to recommended procedures for protecting non-managerial respondents' anonymity in providing responses to performance surveys.

c. Client assumes all responsibility for configuring and managing feedback projects unless contracted in writing for project management services with EchoSpan. EchoSpan support does not have the ability to modify Client responses, survey structure, user databases or other information entered into the system by the Client in the event of a data-entry or any other type of user mistake.

d. Client agrees not to attempt to gain unauthorized access to any portion or feature of the Hosted Service or Site, or any other systems or networks connected to the Hosted Service or Site or to any EchoSpan server, or to any of the services offered on or through the Service, by hacking, password "mining" or any other illegitimate means. Client may not probe, scan or test the vulnerability of the Site or any network connected to the Site, nor breach the security or authentication measures on the Site or any network connected to the Site. Client may not reverse look-up, trace or seek to trace any information on any other user of or visitor to the Site, or any other customer of EchoSpan, including any EchoSpan account not owned by you, to its source, or exploit the Site or any service or information made available or offered by or through the Site, in any way where the purpose is to reveal any information, including but not limited to personal identification or information, other than your own information, as provided for by the Site. Client agrees that it will not take any action that imposes an unreasonable or disproportionately large load on the infrastructure of the Site or EchoSpan's systems or networks, or any systems or networks connected to the Site or to EchoSpan. Client agrees not to use any device, software or routine to interfere or attempt to interfere with the proper working of the Site or any transaction being conducted on the Site, or with any other person's use of the Site.

## 14. DISCLAIMER OF WARRANTIES

EXCEPT AS EXPRESSLY SET OUT IN THESE TERMS AND CONDITIONS, THE HOSTED SERVICES ARE PROVIDED "AS-IS" AND ECHOSPAN DISCLAIMS ALL CONDITIONS AND WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY CONDITIONS OR WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, NON-

INFRINGEMENT, ACCURACY, QUIET ENJOYMENT, TITLE, MERCHANTABILITY AND THOSE THAT ARISE FROM ANY COURSE OF DEALING OR COURSE OF PERFORMANCE ARE HEREBY DISCLAIMED. EXCEPT AS EXPRESSLY SET OUT IN THESE TERMS AND CONDITIONS, ECHOSPAN DOES NOT WARRANT THAT CUSTOMER'S USE OF HOSTED SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT ERRORS WILL BE CORRECTED.

## 15. LIMITATION OF LIABILITY

TO THE EXTENT PERMITTED BY LAW (A) IN NO EVENT SHALL ECHOSPAN BE LIABLE, WHETHER UNDER THEORY OF CONTRACT, TORT OR OTHERWISE, FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, OR SPECIAL DAMAGES (INCLUDING ANY DAMAGE TO BUSINESS REPUTATION, LOST PROFITS OR LOST DATA), WHETHER FORESEEABLE OR NOT AND WHETHER THE PARTY IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) EITHER PARTY'S AGGREGATE CUMULATIVE LIABILITY TO THE OTHER PARTY, IN CONNECTION WITH THESE TERMS AND CONDITIONS AND THE HOSTED SERVICES SHALL NOT EXCEED THE TOTAL AMOUNT PAID BY CLIENT TO ECHOSPAN FOR HOSTED SERVICES IN THE MOST RECENT TWELVE (12) MONTHS.

## 16. INDEMNITY

THE PARTIES AGREE TO DEFEND, INDEMNIFY AND HOLD ONE ANOTHER HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITY COSTS AND EXPENSES (INCLUDING BUT NOT LIMITED TO ATTORNEY'S FEES) ARISING FROM THEIR VIOLATION OF THIS AGREEMENT OR ANY THIRD-PARTY'S RIGHTS INCLUDING BUT NOT LIMITED TO INFRINGEMENT OF ANY COPYRIGHT, VIOLATION OF ANY PROPRIETARY RIGHT AND INVASION OF ANY PRIVACY RIGHTS.

## 17. ECHOSPAN COPYRIGHT NOTICE

You may print and download portions of material from the Site. We retain ownership and all rights to EchoSpan logos, trademarks, software, trade secrets, databases, reports, and the Site.

## 18. SERVICE AGREEMENTS

EchoSpan may enter into a written subscription agreement, license agreement, services agreement or similar agreement executed by an officer of EchoSpan with certain Clients (each a "Service Agreement"). If there is a conflict between these Terms and Conditions and the Service Agreement, the applicable Service Agreement will control.

## 19. GENERAL PROVISIONS

a. The Hosted Services will be accessed and delivered via the internet. Customer is responsible for obtaining the necessary equipment and internet connection that is sufficiently capable of accessing and using the Hosted Services.

b. Client agrees to use Hosted Services in compliance with applicable law, and not: (a) resell, sublicense, lease, time-share or otherwise make Hosted Services available to any third party other than as contemplated by this Agreement; or (b) use the Hosted Services to send or store infringing or unlawful material or material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs.

c. Client agrees to not (a) modify, copy or create derivative works based on the Hosted Services; (b) reverse engineer the Hosted Services; (c) access the Hosted Services for the purpose of building a competitive product or service or copying its features or user interface; (d) create Internet "links" to or from any Hosted Service, or "frame" or "mirror" any content forming part of Hosted Service, other than on Client's o

its affiliates' own intranets or otherwise for its or its affiliates' own internal business purposes; or (e) use the Hosted Service, for purposes of product evaluation, benchmarking or other comparative analysis intended for publication without EchoSpan's prior written consent.

d. These Terms and Conditions will not be interpreted or construed as: (a) creating or evidencing any association, joint venture, partnership, or franchise between the parties; or (b) imposing any partnership or franchise obligation or liability on either party. Client must not represent to anyone that Client is an agent of EchoSpan or is otherwise authorized to bind or commit EchoSpan in any way without EchoSpan's prior authorization. These Terms and Conditions do no create any third party beneficiary rights.

e. Client may not assign its rights, duties, or obligations under these Terms and Conditions or any license without EchoSpan's prior written consent. If consent is given, these Terms and Conditions will bind Client' successors and assigns.

f. EchoSpan may freely assign its rights, duties, and obligations under these Terms and Conditions and any license. EchoSpan may utilize a subcontractor or other third party to perform its duties under these Terms and Conditions.

g. Each party will be excused from any delay or failure in performance hereunder, other than the payment of money, caused by reason of any occurrence or contingency beyond its reasonable control, including but not limited to acts of God, earthquake, labor disputes and strikes, riots, war and governmental requirements (each a "Force Majeure Event"). The obligations and rights of the party so excused will be extended on a day to day basis for the duration of the Force Majeure Event.

h. Any legal action by Client arising out of these Terms and Conditions, the Hosted Services or the Site must be initiated within one year after the cause of action arises.

i. The waiver by either party of any breach of any provision of these Terms and Conditions does not waive any other breach. The failure of any party to insist on strict performance of any covenant or obligation in accordance with these Terms and Conditions will not be a waiver of such party's right to demand strict compliance in the future, nor will the same be construed as a novation of these Terms and Conditions. No waiver of any provision of these Terms and Conditions shall be effective unless in writing and signed by Client and EchoSpan.

j. If any part of these Terms and Conditions is found to be illegal, unenforceable, or invalid, the remaining portions of these Terms and Conditions will remain in full force and effect. If any material limitation or restriction on the grant of any license to Client under these Terms and Conditions is found to be illegal, unenforceable, or invalid, the license will immediately terminate.

k. These Terms and Conditions (along with any applicable Service Agreement) represent the entire agreement of the parties, and supersede all prior or contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter.

Product Overview

Features & Pricing

Competency Library

Review Templates

Feedback Reports

Supported Languages

Product Guides

Development Planning

Security & Availability

Engagement Surveys

Project Management

Custom Solutions

Consultant Licensing

Company Overview

Support

Contact Us

News and Articles

Site Map

Terms & Conditions

Privacy Policy

Privacy Shield

GDPR Compliance

Data Processing Agreement

Phone: 404-496-4096

Toll Free: 888-300-9978

Fax: 404-496-4096

Copyright 2021 EchoSpan, Inc.
NEU-PRD-WEB02